UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

ICONIC MARS CORPORATION,         .
                                 . Docket
            Plaintiff,           . No. 22-cv-0092-CAB-DEB
                                 .
                v.               . August 19, 2025
                                 . 10:00 a.m.
KAOTICA CORPORATION,             .
                                 .
            Defendant.           . San Diego, California
. . . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE CATHY ANN BENCIVENGO
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

For the Plaintiff:      SML Avvocati, P.C.
                        888 Prospect Street, Suite 200
                        La Jolla, California 92037
                        By:  STEPHEN LOBBIN, ESQ.

For Stephen Lobbin:     Witham Mahoney & Abbott, LLP
                        401 B Street, Suite 1900
                        San Diego, California 92101
                        By:  MATTHEW M. MAHONEY, ESQ.

For Mr. Olaleye:        In propria persona
                        15709 Arrow Highway, Suite 5
                        Irwindale, California 91706

For the Defendant:      Kilpatrick, Townsend & Stockton, LLC
                        1420 Fifth Avenue, Suite 3700
                        Seattle, Washington 98101
                        By:  DARIO MACHLEIDT, ESQ.
                             KRISTIN ADAMS, ESQ.
                             KATHLEEN R. GEYER, ESQ.

Court Reporter:         Chari Bowery, RPR, CRR
                        USDC Clerk's Office
                        333 West Broadway, Suite 420
                        San Diego, California 92101
                        chari_bowery@casd.uscourts.gov
Reported by Stenotype, Transcribed by Computer

SAN DIEGO, CALIFORNIA; AUGUST 19, 2025; 10:00 A.M.

-o0o-

THE CLERK:  We are on the record this morning on Matter Number 1.  This is 22-cv-0092-CAB-DEB, Iconic Mars Corporation v. Kaotica Corporation, on calendar for motion hearing.

Counsel, please state your appearances.

MR. MAHONEY:  Good morning, Your Honor.  Matt Mahoney on behalf of one of the responding sanction parties, Stephen Lobbin.

THE COURT:  Thank you.  Good morning.

MR. LOBBIN:  Good morning, Your Honor.  Stephen Lobbin here.  I guess I am speaking on behalf of Iconic Mars Corporation.

THE COURT:  No, you are not.  You don't represent them anymore.

MR. LOBBIN:  Mr. Olaleye, I don't represent.

THE COURT:  He is -- all right.  Fine.  Whatever.  It is very confusing to me, what is going on on that side, but okay.

MR. LOBBIN:  And we are submitting on the papers anyway.

THE COURT:  All right.

MR. LOBBIN:  And Mr. Olaleye was supposed to be here to speak for himself, but he is not here.

THE COURT:  Mr. Olaleye -- he has electronic access to the docket, so he had notice of the hearing.  And the Court will note it's after 10:00, and he has not appeared at this point.

MR. LOBBIN:  And I haven't been able to reach him.

THE COURT:  All right.

MR. MACHLEIDT:  Good morning, Your Honor.  Dario Machleidt, on behalf of Kaotica.  With me today are Kate Geyer and Kristin Adams.

THE COURT:  Thank you.  Good morning.

We are here on the application for fees and costs that was submitted by Kaotica in response to the Court's order fee-shifting to them in this case, under both the Lanham Act against Iconic Mars and Mr. Olaleye as now a judgment debtor for Iconic Mars, as well as a sanction against Mr. Lobbin under Section 1927, as well as the Court's inherent power to sanction him.

With regard to the motion, the application, and the addressing it against Iconic Mars and Mr. Olaleye, the Court has found that there has actually been no response from that party or Mr. Olaleye with regard to fee shifting under the Lanham Act for willful infringement, which gives the Court authority to find the case extraordinary and therefore to do that fee shifting, or any real detailed response to the application, which was an extremely detailed application for

fees that set aside a significant amount of fees that the party does not seek to recover here, and that the rates that were claimed by Kilpatrick in this case represent the rates in the community, and I think they are fair and reasonable.

Mr. Lobbin, you said you are still here to represent Iconic but submitting on the papers.  Is there anything else you would like to say regarding the fee application under the Lanham Act?

MR. LOBBIN:  No, Your Honor.  Thank you.

THE COURT:  All right.  With that, then, the Court does -- and I will issue a written order, obviously, on all of this.  But I find the application is adequately supported; that the reasonableness of the hours in the case was not challenged by Iconic; and the Court does award the $1,793,873.82 that you have requested.

(Mr. Olaleye entered the courtroom.)

THE COURT:  I think Mr. Olaleye just showed up.

Come on in.  You are a little late.  Grab a seat.

MR. OLALEYE:  I am sorry.

THE COURT:  That's all right.

All right.  Mr. Olaleye has just joined us.

The Court was just in the process of confirming the request from Kaotica for the fees that they submitted, the application, in the almost $1.8 million in fees and costs based on the Lanham Act violations.

Mr. Lobbin indicated he was submitting for Iconic Mars on the papers.

Is there anything you would like to say, sir, as you are a judgment debtor as to those fees and the award in the case?

MR. OLALEYE:  Yes, Your Honor.  I would like to say good morning, and thank you so much, and I am sorry for being a little late.  I thank you for the opportunity to be here.  I thank you for working hard on this case, and I am very grateful to have me right here.

I wanted to say, first of all, that English is not my first language, so that's my second language, so please excuse me.

THE REPORTER:  Can you pull the microphone towards you?  Thank you.

MR. OLALEYE:  Yes.

So I wanted to say, Your Honor, first of all, English is not my first language.  That's my second language.  So please excuse me.

And, I am appearing right here as a *pro se* today, and I am not a party to this fee motion in any personal capacity.

THE COURT:  All right.  Again, the Court has determined that fee shifting is appropriate in this case in light of the jury's determination of willful infringement under the Trade Dress Act, and I have reviewed and considered the application made by Kaotica.  I have found that the hours that

they are seeking to recover, as well as the rates, are both reasonable for the recovery here.  And the Court is awarding them the 1.7 million, et cetera, in fees and costs.

And in light of the Court's previous decision that you are a judgment debtor as well on that, I am just -- this is an opportunity, briefly, for you -- you haven't filed anything, but if there is anything you would like to say for the record. But please keep it brief.

MR. OLALEYE:  Yes, ma'am.  Thank you so much.

I would like to say, to my understanding, Mr. Lobbin continues to represent Iconic Mars and is not representing me personally.  I am not responsible for him acting on my behalf regarding of this motion and previous motion.  I did not sign the waiver to restrict my ability to defend myself, especially if those defenses include arguments about prior legal representation.  I respectfully ask the Court to recognize my separate status as an individual who is not responsible for the legal fees of Kaotica seeking from the corporation.

And I've been working on a Rule 60 motion to properly contest the judgment against me, and I intend to file that shortly after today.

I have overwhelming evidence that shows that I did not commingle any funds.  My funds will be Iconic Mars.  I have a business bookkeeper, that look into all the finances of the company, so I separate Iconic Mars' finances, and it's separate

from my personal finances.  All I did was contributed to Iconic Mars and I did not --

THE COURT:  All right, sir.  I appreciate that.

If you want to bring that motion -- I am not sure it's timely, but you may file that.  But at this point, this is not a motion for reconsideration on the Court's order that was entered in June finding you to be a judgment debtor in this case, and so I am not going to hear that argument today.

This was strictly limited to the application for the amount of fees that were reasonable that they incurred.  Again, there was nothing really filed to challenge those numbers based on the Lanham Act fee shifting.

MR. OLALEYE:  So, in regards to the fee, I wanted to say personally that Iconic Mars, as a corporation, since 2021, since the company was founded, over all the years of the company, the company has only generated about half a million, all through the whole years.  This is including all the expense, operation expense.  The company has no profit.  The tax return has shows that the company has no profit.

And they are aware that the company is a small business and is not capable to pay this amount because the company itself has never generated this type of profit before, this type of income, even through the whole life span of the whole company, where the company existed for about four years, you know.  And they seen all these things.

And I remember before -- after the judgments, and I had to liquidate all the inventory that Iconic Mars has, this is all the contribution I have personally made into this company.  I went through tremendous pain to take over 10,000 products that Iconic Mars owns, and I had to discard all this product.  But before I discard this product, I specifically asked Mr. Lobbin that, would Kaotica consider taking Iconic Mars' product so that I can get rid of this product and then take the profit and give it to them.

This is when their attorney's fees were about a million.

This product could be worth about a million dollars, if it was sold.

They rejected it, and I don't know why they rejected it, even though at a time when the company -- they knew all along that the company has no assets.  The company is a very small company.  They see the bank statements.  And they are quite aware that the company is at loss.  They saw everything, even they dig into my personal assets and realize that I have nothing.  As a matter of fact, I come here to court with all my personal bank statements to openly show the Court.

THE COURT:  Sir, I am not going to review those. There was discovery done in this case with the magistrate judge.  But I understand your position here is that the amount of the award exceeds anything that your company or you could pay.

Does that pretty much sum it up?

MR. OLALEYE:  Yes, Your Honor.  The amount is -- and the reason why they refused to take the product that could have --

THE COURT:  I don't care about that, honestly.  I mean, that -- whatever you all tried to negotiate after the jury found you were willfully infringing their trade dress was between you, and I know there were efforts by the magistrate judge.  But I understand your position here is that you can't meet this award.

MR. OLALEYE:  Yes, Your Honor.

THE COURT:  Sir, is there anything you would like to say on behalf of Kaotica in response to that?

MR. MACHLEIDT:  Very briefly, if I may, Your Honor.  I may have the timing wrong in terms of what Mr. Olaleye just said about a sell-off, but just to put on the record, to make sure people later have the full context, if you look at docket 119-7, that is what we have been referring to as the Kaotica sanctions letter.  And if you -- I have copies if you would like to see it right now.

THE COURT:  I do not have that with me on the bench right now.

MR. MACHLEIDT:  May I approach, Your Honor?

THE COURT:  Sure.

MR. MACHLEIDT:  Your Honor, if you flip to the very

last page of this document, of this letter that Kaotica, through me, sent to Mr. Lobbin in July of 2022, there's a settlement proposal that Kaotica made that was never responded to.  I won't go through all of the terms, but Term Number 2 and 3 provide that Iconic can sell off its existing 1.0 and 2.0 inventory.  And frankly, at that time, it could have retained whatever profits it made.

So in terms of a sell-off, I did hear Mr. Olaleye say we refused or Kaotica said no.

What I am aware of is, of course, down the road, the injunction required him to destroy the infringing products.

Earlier in the case, we were actually the party, Kaotica was the party that offered for Iconic to do a sell-off, and there was no response to this sell-off or to this offer.

THE COURT:  As I understand, he is talking about this litigation.  This is post the first litigation.

MR. MACHLEIDT:  This letter is with respect to this litigation, the second litigation.

THE COURT:  Well, the letter is from 2022.

MR. MACHLEIDT:  Correct.

THE COURT:  And what they could go forward on rather than litigate this second case.

But what I understand he was saying is that, after the judgment came down in the trial in this case and he had product that, in light of that judgment, he needed to get rid of, he

was somehow offering it to Kaotica to take it and sell it and keep the profits from it.

MR. MACHLEIDT:  I agree with you.  That's what I -- I believe that that was at least one understanding of what he said.

But just to cover my bases, in the off chance he was talking about this sell-off, I just wanted to flag this letter for the Court.

THE COURT:  I am not sure that's relevant to the analysis, whether you wanted to take his products and sell them or not.  That's really not part of what the Court's considering here.

MR. MACHLEIDT:  Agreed.

THE COURT:  Is there anything else, sir?

MR. OLALEYE:  Yeah, in addition to what he said, I have made several attempts for Iconic Mars to help find a way to cover all this legal expenses.

And the time that this letter was written, it was around when their legal expense was about a million dollars.  The inventory that I had to discard -- and I paid -- the company paid over $1,000 just to discard over 10,000 products.

These are all the contributions I have made into Iconic Mars for years, from families and friends and loans that I poured into the company's account, to buy all this inventory, because I believed so much into the company.  And I never knew

that I am going to lose the company.

And I took all those products, and offered it to them, and I said, "Hey, if we sell those products, you can recoup all the profit from this product to cover any expense that might come."

I did everything in good faith, but they rejected it. And I don't know why they rejected it, even though they knew from the very start that Iconic Mars has no income, has no profit. The tax return has shows that Iconic Mars is not making profits. The deposit has shows that Iconic Mars has not make any profit. And they saw all these numbers, and they knew the business was falling apart from the very start, that I suffered so much and poured all my contribution into Iconic Mars, and I lost everything on this company. But they rejected the offer, and now left me in a situation where I have nothing, the company has nothing, and I don't know where to get $2 million. I have never seen this type of money before in my entire life.

THE COURT: All right, sir. Thank you.

Again, the ability to pay is not -- the Court has found no authority under the Lanham Act that the ability to fee shift is based on an ability to pay. If you can't pay it, you can't pay it. They will have a judgment that they can try to collect if some day you come into money. But the Lanham Act, in and of itself, the fee-shifting provision doesn't have consideration based on ability to pay. And they are entitled, under this Court's assessment of the case and the jury's finding of

willful infringement, to get that fee-shifting award.

So your positions are preserved for any appeal you want to take here, but the Court's tentative is in place on that matter.

I would like to turn to the sanctions against Mr. Lobbin.

Mr. Mahoney?

MR. MAHONEY:  Yes, Your Honor.  Thank you.

If I might be heard?

THE COURT:  Yes.

MR. MAHONEY:  May I take the podium, please?

THE COURT:  Yes.

MR. MAHONEY:  Thank you.  Good morning, Your Honor. Matt Mahoney.

I know the Court indicated earlier it is somewhat confusing as to how the representation lines up in this case, so let me be clear for the record.  I am here to represent and speak on behalf of just Mr. Lobbin.  I do not represent Iconic Mars in this case, nor do I represent Mr. Olaleye.  That is the capacity in which I am here before you today.

On the one hand, coming before this Court at this phase is unenviable.  We are at the phase right now where the Court has -- where the trial has concluded, the Court has already awarded -- or determined, I should say, that sanctions are appropriate.  And so some might say I am late to the dance. But there are advantages to my coming in at this point because

what I know and all I can know is what is in the record before this Court.

So I am going to limit my arguments today to what is perceptible from the record in terms of what appears in transcripts and in filings and pleadings before this Court. And to that end, that creates a road map of what I would like to discuss with the Court today in terms of what I am going to address and what I am not going to address, just to give you some sense of where my arguments will be focused.

Because, obviously, I will not be addressing today whether or not fees should be awarded against Mr. Lobbin. I have reviewed the transcript. I understand that that determination has been made. I will leave it at that.

I also will not address today the issue of whether or not Mr. Lobbin acted subjectively in bad faith. After reviewing the papers that have been filed with this Court, that has been addressed *ad nauseam*, so I am going to stand on the papers as they address the issue of subjective bad faith and whether or not his conduct constituted subjective bad faith.

What I am here to argue today, Your Honor, as this Court has invited from both parties, is the reasonableness of the sanctions that are being sought by opposing counsel against Mr. Lobbin in the amount of, as you have noted, approximately $1.8 million.

And in addressing the issue of reasonableness, I do want

to note primarily that I think opposing counsel would like to limit that issue to the reasonableness of their rates, the time collectively spent in this case, the number of people working on certain matters.

But reasonableness, as addressed by *Yagman* and its progeny, goes to something that's much more specific, which is where I am going to focus my comments; and that is on the causal nexus between the conduct that this Court has identified as misconduct and the resulting fees that arose from that misconduct, and that's where I am going to address my arguments.

The Court, in reviewing the transcripts and the record, has determined that sanctions are appropriate pursuant to 28 U.S.C. 1927 and also to the Court's inherent powers.  Two separate provisions, two different powers for the Court to award sanctions, and, really, two different bodies of law that converge at a certain point.  But because they are two different bodies of law, they require two separate analyses. They must, because that's how they have been addressed by the courts.

So what I would like to do is first address the award of sanctions under 1927; and then, secondly and more briefly -- because there is crossover -- to address the Court's exercise of its inherit powers.

THE COURT:  I would suggest you focus on inherent

powers because the *Yagman* decision, which is cited heavily in the filings here that was made, fails to cite the subsequent footnote that was added to that opinion after the rehearing was denied, saying that "Nothing we have said in this opinion should be construed to impair in any way nor to preclude an award based on bad-faith conduct under the Court's inherent power if found to be appropriate."

So let's set aside the statutory 1927. I have looked at that for purposes primarily of determining whether the award needs to consider ability to pay, which is certainly an aspect of the statutory award. But the inherent powers of the Court are much broader.

And if one looks at *Fink v. Gomez*, a Ninth Circuit case from 2001, authored by Judge McKeown, she goes on in that case to talk about, "For purposes of imposing sanctions under the inherent power of the Court, a finding of bad faith does not require that the legal and factual basis of the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy or *mala fides*, the assertion of a colorable claim will not bar the assessment of attorney's fees."

In this case, the Court has considered the arguments raised repeatedly by Mr. Lobbin in representing Iconic in bringing this case, in representing matters to the Court, that he was being intentionally and willfully obstinate that his

client was not bound by the stipulated judgment.

The stipulated judgment from the '21 case admitted the trade dress as defined by Kaotica to be only the external aspects of their eyeball device.  It was actually discussed at length in the contempt motion.  And I have transcript records where he has said to the Court in those proceedings, "We did not agree.  We did not agree to the definition.  We did not think it was adequate.  We did not infringe any trade dress.  We did not admit infringement of any trade dress.  And yet we signed an agreement in which we defined the trade dress, as defined, by their rights as the trade dress holder, of Kaotica, as the external aspects of the design."

And the Court may not have been as clued in to where he was going at that contempt hearing, but it certainly became obvious over time, to me, that he brought this case and continued this case on the basis that he wanted to argue to the jury that there were internal design changes, aspects of the redesigned Comet, the density of the foam, the internal carvings -- which may have been very relevant to the prior patent claims but had nothing to do with the trade dress claims -- and that he wanted to have the jury define the trade dress the way he was promoting it.

And that was contrary to the law.  It was contrary to his contractual obligations he entered on behalf of his client.  And I am still struggling with how many times I had to tell

him, "Don't go there," and yet he continued to try and raise those issues.

It just seemed subjectively obstinate and in bad faith to me that this case was filed and litigated on the basis that there was no agreement as to the scope of the trade dress.

Why don't we focus on that.

MR. MAHONEY:  I will, Your Honor.  And I appreciate you clarifying your ruling.

Just for purposes of 1927, then, am I understanding correctly that the Court will not award sanctions pursuant to Section 1927?

THE COURT:  As you have said, it overlaps.  There were certainly some things that happened in this case, isolated things, like the *Daubert* motion, which I think was just frivolous.  Those were small matters.

The bigger picture was the entire initiation of the case. And then, by the time we got to the motions *in limine*, how clear it was that the positions that were being asserted, from the Court's perspective and the record, was that somehow these changes that Iconic asserted they made in the design brought them outside the scope of the trade dress because they were trying to redefine and ignore and just not agree to what they had bound themselves to.

Whether or not there was ever trade dress infringement in this case in the first instance, that ship has sailed; that

horse has left the barn.  They agreed to it.  They said, "Our product infringes your trade dress."

And then the issue at trial, on the second case, should have been, "Did the redesigned product also infringe that trade dress?"  And what we went circularly around was, "What is the trade dress?  That's not their trade dress."

But that's what they contractually admitted it was.

And it became a constant circular argument to the point when Mr. Olaleye, on the stand, testified that the accused product in the first case was, in fact, the product that was being accused in the second case, that generated a scurry of litigation in the first case to say there was some kind of error in the attachment of that product, when that had been front and center in the contempt motion, and reviewed and considered and discussed at length, and not one time did anybody on Iconic's side go, "You know what?  That's the wrong exhibit.  That's not what it was supposed to be."  They said, "We are different than that exhibit."

Again, there's just this constant shifting to correct bad litigation, bad testimony, and to continue to try and confuse the jury.

I know you wanted to talk.  It is your turn.

MR. MAHONEY:  Well, Your Honor, actually, I appreciate the comments, because, obviously, I am trying to focus on what Your Honor is focusing on.

And I am willing to not address Section 1927, and I am not trying to be overly exacting on this point; but I am willing to not address Section 1927 if there's not going to be a ruling that any aspect of sanctions are based on Section 1927.

Do you understand where I am coming from?

THE COURT:  Again, the Court recognizes sanctions under 1927 require an assessment of ability to pay.  I am not sure in the inherent power that that's a necessary element, but I do recognize that, which was why we ordered the discovery about ability to pay.  And so the Court is taking that into consideration, that aspect of a statutory award.

MR. MAHONEY:  I understand.

Well, then, I will leave the Section 1927 analysis just by saying a few brief comments, and then we will move on, to the extent that there's any bleed-over between those two analyses; because, as you have noted, these are two separate analyses, two different areas of law.

And the luxury that I have today, Your Honor, is that I will not attempt to disabuse you of your views of what happened at trial.  That's not why I am here today.

But Section 1927, to the extent that it is going to inform your opinion in any way, contemplated that very type of issue because a large part of Section 1927, which then bleeds over into the analysis of the inherent powers, has to do with this issue of the causal nexus between the conduct and the fees.

And that's important.  Not only because *Yagman* was a 1927 case which specifically dealt with those issues, but also because the transcript reflects that, in the Court's exercise of your inherent powers, you asked for that same causal nexus, and I want to address that.  But some of these issues *Yagman* addressed and dealt with.

Here is how the Ninth Circuit described the award of sanctions in that case, which as you may recall, was for virtually all of the fees in the case.

"The procedure imposed by Judge Real in imposing sanctions, therefore, was essentially an accumulation of all perceived misconduct from filing through trial with a reevaluated determination that it was far more serious than appeared at the time.  The result of this procedure is a single post-judgment retribution in the form of a massive sanctions award."

So although I am not focused on, again, the extent to which the financial ability to pay may be different between the two, there is a comment there about this nexus and why it is important.  And it is important for Section 1927, and we are going to see that it is important for inherent powers.

THE COURT:  Where is it part of the inherent power case law?  Because there is that distinction.

I don't think, in the subsequent edit to *Yagman*, where they say, "This has nothing to do with the imposition of

inherent powers," and the assessment, which talks about the overall conduct and the Court's assessment of the overall conduct of the litigation, limits it to it being a one-to-one sort of correlation between something counsel did that caused excessive fees and unnecessary fees to the other side, which again, ultimately I am not going there.

This -- having reviewed what really was largely an inappropriate motion for reconsideration in counsel's opposition to the fee award, but, you know, addressing largely focused on, you know, a correlation under 1927, the Court's like, "Okay.  Fine.  If it is not -- I can't pinpoint, or they did not pinpoint this and this and this and that as filings or actions or things taken that were unnecessary, great.  We will set that aside."

The Court did originally issue the sanctions also under my inherent power to do so.  I sat through this litigation.  I heard all the arguments.  I heard Mr. Lobbin stand there and tell me repeatedly that there was no trade dress definition in this case and that he continued to try and define it beyond the scope of what the original contractual obligation was, and it went right up through argument, to the jury.

And, you know, frankly, I think the jury's result here showing that whatever they were trying to argue was not at all meritorious, because they found willful infringement in the case.

So I appreciate -- there was a lot of focus on 1927 in the opposition, and that may be what you prepared to address today, but I am not persuaded here that I can't look at the overall context of the litigation.

MR. MAHONEY:  I understand.  And, Your Honor, I am prepared to address both.

And the reason that I was focused -- and again, I come with a disadvantage of what is in the transcript.

What is in the transcript is, at the initial hearing, the Court's focus was on Section 1927 and the various individual things that Mr. Lobbin had done during the course of trial.

You recall Your Honor's statements about, "You weren't listening when," and you went through a litany of things, where you started each one with, "You weren't listening when."  You listed out the individual ones.

And it wasn't until opposing counsel said, "Your Honor, perhaps you should also consider adding the Court's inherent powers to your ruling," that subsequently, yes, it did appear in the written order.

But that's the only reason why I was prepared to address Section 1927.

And if, as I am understanding, that the Court's actual focus is on inherent powers, I am prepared to address those as well.

THE COURT:  Go ahead.

MR. MAHONEY:  The Court's exercise of inherent powers is similar to the award of sanctions under Section 1927 in the sense that there still must be a showing of a causal nexus.

Now, we did cite to a case called *Harper v.* -- not "we." Mr. Lobbin cited to a case of *Harper v. Nevada* in the brief, which also cited to the oft-cited case of *Goodyear Tire & Rubber Co. v. Haeger*.

*Harper v. Nevada* came out of the District Court of Nevada. And then *Goodyear* went up to the Supreme Court, in 2017, with Justice Kagan drafting the opinion.

The Supreme Court, in *Goodyear*, was evaluating the bounds of a Court's exercise of its inherent powers.  And the Court was expressly evaluating whether the District Court's exercise of inherent powers required a causal connection between the alleged misconduct and the fees and the costs sought.  Because, as the Court noted, there seemed to be some disagreement in the Ninth Circuit about whether and to what extent causal nexus was required under those inherent powers.

Justice Kagan wrote the following in determining whether that causal nexus still applied.  She wrote, "That means pretty much by definition that the Court can shift only those attorney's fees incurred because of the misconduct at issue. Compensation for a wrong, after all, tracks the loss resulting from that wrong, so as we have previously noted, a sanction counts as compensatory only if it is calibrated to the damages

caused by the bad-faith acts on which it is based."

She went on to write later, "Hence, the need for a Court, when using its inherent sanctioning authority and civil procedures, to establish a causal link between the litigant's misbehavior and legal fees paid by the opposing party."

That's at page 108 of the opinion.

She writes, at page 112, "The complaining party may recover only the portion of his fees that he would not have paid but for the misconduct."

So, two things. One is the court does give, obviously, wide latitude to a judge to exercise those inherent powers, one; but then, two is, reaffirms the fact that there still must some causal link, as Justice Kagan put it, between the conduct and the fees.

And that's important in this case because, Your Honor, as we read -- as we read your order and as we read the transcript, it seemed that you are aware of that causal link requirement and it seemed that in the exercise of your inherent powers, you ask counsel to address those instances of misconduct.

And we -- Mr. Lobbin went through, in his opposition, and took out of your order, the written order, the ten things that you specifically address in that order. And that appeared to be -- and maybe now I am understanding that it is not, but that appeared to be how you were exercising your discretion.

In other words, you asked counsel to address and to show

the fees incurred in these individual things.  Like, "Counsel refused to acknowledge the scope of Kaotica's trade dress claim and attempted to redefine Kaotica's rights," as you just mentioned.

THE COURT:  And that permeated the entire case.

MR. MAHONEY:  I understand.

And that's why there's case law, legion, discussing the fact that the causal link cannot just address everything that happened in the case.  That's not a causal link.

THE COURT:  Again, you are focused on 1927, or at least that's what Mr. Lobbin's papers focused on when he made somewhat edited references to comments that the Court made.

But, you know, the discussion here about sanctions under 1927, "The Court should first consider the need to deter future bad-faith tactics; the degree to which the defendants could have and didn't mitigate excessive costs and fees caused by the bad faith, and counsel's ability to pay."

Those all go to 1927.  I -- all right.

MR. MAHONEY:  But there's still an argument made and there is still precedent by the Supreme Court that although I think those are the factors that the Court can consider and did consider in the decision about whether or not to impose sanctions, what we are talking about today is the reasonableness of those fees.

THE COURT:  Do you have a proposal?

In light of the fact that the Court has found sanctions appropriate under my inherent authority, based on the manner in which this case was initiated and litigated, what would be an appropriate sanction here for counsel?  What do you think -- given the amount of fees they incurred and the reasonableness of their application, deducting many things that they are not seeking, what are you offering to the Court as something that would be a reasonable sanction?

MR. MAHONEY:  I want to address your question two ways.

First of all, Mr. Lobbin, it is my representation, already did make an offer of what he would be financially able to pay pursuant to an award under the inherent powers of the Court in the amount of $50,000.  That was already expressed by him.  I am not going to overrule him because that's his estimation of what he can pay.

But I do want to address one statement by Your Honor just to make my record clear about whether or not there was a causal link demonstrated, as is required, even under the inherent powers of the Court.  Because, as you know, opposing counsel argued that "It doesn't matter because, A, we have applied for sanctions under both 1927 and the inherent powers; and, B," as they write, "regardless, we have gone through and we have done a causal analysis.  We have performed that for the Court."

And in doing so, they cited to docket 175-2, at pages 10

through 13, to suggest that they have gone through this process, that they have shown that causal link.

And I would invite the Court to look at docket Number 175-2 submitted by opposing counsel in support of these sanctions. There's a table 2 that appears in that document. And I am happy to pause for a moment.

THE COURT: No, I have it. Go ahead.

MR. MAHONEY: If you go to page 9, table 2, there is a chart or table that is prepared that shows the stage of litigation. And then, you will notice that this chart does not address any of the ten instances of misconduct that you articulated both in your written order or in oral argument.

These are temporally based. In other words, the first category of fees pertains to the time between the answer and the sanctions letter; another category for the time between the sanctions letter and the close of all discovery; for the time between the close of all discovery and the summary judgment order, et cetera, et cetera.

So it is a temporal assessment of the causal link between fees. And Justice Kagan rejected that as well, Your Honor, rejected that specifically in the *Goodyear* case, which was an inherent powers case.

What she said was, "Still, the Court of Appeals" -- that's the Ninth Circuit -- "left the larger sanctions in place because it too mistook what findings were needed to support

that award.  In the Ninth Circuit's view, the trial court could grant all attorney's fees incurred during the time when Goodyear was acting in bad faith."

Similar to Your Honor's comments about the fact that "I find that bad faith was pervasive."

But the Court find -- Justice Kagan found the following: "But that is a temporal limitation, not a causal one.  And like the District Court's egregiousness requirement, it is wide of the mark.  A sanctioning court must determine which fees were incurred because of and solely because of the misconduct at issue, however serious or concurrent with the lawyer's work it might have been.  No such finding lies behind the 2.7 million award made and affirmed below."

You know, the rest of what is cited in the moving papers to support this causal link just attaches about 150 pages of bills that are only highlighted to show the fees that were not sought but not tying any of those fees to any specific task or grouping those fees to any specific ask or any task.

And Your Honor, I think it is important to note that it appeared to us, and to me, in my review of the record, that you asked for more.  And it appears that opposing counsel did not comply with that request.

And I would respectfully submit to this Court that I think opposing counsel is inviting error that is asking you to prepare -- to do one of two things.  Either to just award a

lump sum, not causally tied to any particular conduct, or for you to go through 150 pages of fees and pick something out. And I don't believe that the case law requires or allows that either, Your Honor.

THE COURT:  I am struggling here, at the moment, while you are talking, to find in the pleadings or the materials that have been submitted to the Court a reference to this *Goodyear* case by Iconic.

MR. MAHONEY:  Give me one moment, Your Honor.

THE COURT:  I don't see it.

There's never a table of contents -- thank you very much, despite the fact the local rules require it -- of what cases are cited.  So I am paging through these, trying to find this case that you are hinging an awful lot on to tell me that I need, even in an inherent authority case, to make individualized findings as to the amount directly -- not broadly, causally related, but directly related to specific conduct, and I do not.  Maybe it is in here; maybe it is in a footnote.  I can't find it having been brought to the Court's attention.

MR. MAHONEY:  Give me one moment, Your Honor.

THE COURT:  Sure.  Otherwise, just give me the case cite.

MR. MAHONEY:  All right, Your Honor.  This appears in Mr. Lobbin's opposition to the motion for fees.  It is document

Number 196.

THE COURT:  I have it in front of me.

MR. MAHONEY:  It is footnote 30, which appears on page 18.  And in that footnote, about two-thirds of the way down, Mr. Lobbin wrote, "Moreover, under the inherent power, as with 28 U.S.C. Section 1927, the Court must adhere to a strict causal nexus.  See *Harper v. Nevada*, 522 F.Supp.3d 1033, 1047.  'Inherent powers requires a but-for test, by which the movant may recover only the portion of its fees it would not have paid but for the misconduct,' citing *Goodyear Tire & Rubber v. Haeger*, 581 U.S. 101."

THE COURT:  All right.  Thank you, Counsel.  I think I have heard enough.

MR. MAHONEY:  If I might just add one last and final comment, one of the principles articulated by the *Yagman* case -- which I know is a 1927 case, but I think is applicable here -- talks about the impact of a ruling like this in the legal community.

I want to note, it notes two things.  One is when the Court talks about the impact of that ruling, it says, "We are" -- "Nothing in this ruling is meant to sanction the conduct of the attorney," Mr. Yagman, in that case.  A.

B is the Court also made clear, "We are sympathetic to the views expressed by the Court as to that misconduct."

And I would echo those same thoughts.

But the part that I do want to just leave Your Honor with is the following:  The Court stated that a ruling like this, a ruling in the amount of approximately $1.8 million, against a small firm like this, in San Diego, has the potential to send ripples through the community.  And the Court, in *Yagman*, requested, asked, or advised the District Courts to refuse that inclination to punish, even when punishment might be -- might be due.

I will tell you that attorneys in San Diego will notice a $1.8 million sanction award.  My guess is attorneys in the Southern District.

It is an important ruling.  And that is why the Court's inherent powers -- and this was cited throughout the briefs -- they are urged to be exercised with caution and with vigilance.

I would ask for Your Honor to do that today as you are contemplating the award of sanctions.

THE COURT:  All right.  Thank you, Counsel.

Kaotica?  Response?

MR. MACHLEIDT:  Yes, Your Honor.  May I present from here?  I have a little collection of papers.

THE COURT:  Sure, you can.

MR. MACHLEIDT:  Dario Machleidt on behalf of Kaotica.

Mr. Mahoney ended saying that if the Court goes with us and awards the full amount of our fee request, it will send ripples through the community.

I am not part of this community outside of this case, but I hope he is right because Mr. Lobbin, who has not listened in the prior half dozen times he was sanctioned, and apparently not even this time, because shortly after he was sanctioned in this case, he got sanctioned in yet another case -- he needs to finally listen, and nothing has worked.  And I submit that other lawyers who read this record, who know this case, who hear about this case, they should be deterred from ever litigating the way Mr. Lobbin has litigated here.  So I hope ripples go through the community.

I will give Mr. Mahoney the victory here on, sure, there should be causation.  And there is causation here.

And, Judge, I think Mr. Mahoney kind of danced around what you kept bringing up to the forefront:  Redefining the trade dress or, more appropriately, simply ignoring the definition of the trade dress in the stipulated judgment that had Mr. Lobbin's signature as well as his client, that is how this case was created.  That was the foundation of this entire case.

Built upon that -- I think everybody has referenced the contempt hearing.  Built upon that, you go back to the contempt hearing.  In that hearing, in addition to redefining and pretending that he did not agree to the trade dress definition, Mr. Lobbin misled this Court in two critical ways that again went throughout the entire second lawsuit.

I know the contempt hearing was in the first.

But he told this Court that his client had complied with the stipulated judgment; in particular, that all the 1.0 advertisements had been taken down.

That was not true.  It took us -- we were new to the case. That took us three minutes to prove that it was not true.  Now, we had to go through the steps of subpoenaing -- serving subpoena on Vimeo to lock it up for trial purposes; but he represented that multiple times.

Separate from that, he also went into detail about all these perceived alleged differences between the 2.0 and the 1.0.  They have never kept a consistent story about that, and I think, at trial, we proved that -- I will stop there.  They haven't kept a consistent story.

But I will note, in their interrogatory responses, that were never supplemented, they said, "The primary difference between the aesthetic design of the Version 1.0 Comet and the version 2.0 Comet is the inner cavity."  That was it.

And now, potentially as they realized that was really going to hurt them, it's evolved and changed back to what they said in the contempt hearing.

But the point is these were misrepresentations that, back then, Judge, you had no reason to disbelieve what you were being told.  And then this case progressed.  Those were the foundational points of the complaint.  And the case went forward.

And I am glad you mentioned the transcripts.  Mr. Mahoney didn't live this case the way you did and the way we did, but even looking at the cold transcripts, from summary judgment, from pretrial, from motions *in limine*, it is abundantly clear that Mr. Lobbin intentionally injected confusion at every stage of the case.

Over and over in his briefing, and certainly in his arguments, our team was forced to correct him, to correct the record; that what he was arguing for 2021 was actually 2022, and vice versa.  It was -- the worst of it was, as you said, a completely, just, bad-faith, unmeritorious *Daubert* motion that required our expert to come here for the hearing, me to come here, and ultimately, when we gave you the full report, it was clear that, truly, everything Mr. Lobbin said that was wrong with Mr. Roberts' reported was incorrect.  It was either legally incorrect or, factually, he pulled it out of thin air.

There is causation.  This case does not exist without Mr. Lobbin.  He's had his hand in this case from the beginning.

And whatever burden and whatever standards Mr. Mahoney thinks is required of the Kaoticas of the world in terms of pointing out time entries, that "Mr. Lobbin today did another thing wrong, and therefore..." and, "He did it again and we corrected the record," that's not how litigation happens and there is no requirement that we do what he is asking of us.

As you indicated, as he pointed out, yes, we have a

temporal table to help the Court. You don't have to start and stop with this table. It is an assistance.

Now, if they -- they had nothing to say about our individual time entries; but we gave them, again, because if they had complaints; if they wanted to say, "You know what? No. This was not Mr. Lobbin. This was Mr. Olaleye," if you wanted to toss somebody else under the bus. We gave them our entries. And they have nothing to say, other than, "That's a big number, and it is going to hurt."

Your Honor, may I have ten seconds to look at my colleagues and see if there's more to say?

THE COURT: Yes.

(Counsel confer.)

MR. MACHLEIDT: Ms. Geyer reminded me that docket 175, my declaration, there's a lot more than just that one table, on page 9, and as I think you indicated, we cut plenty. We kept the case essentially to the three of us, the trial team, and our paralegal, trial tech individual, the people who the Court actually saw, and so you can use your judgment and say was it reasonable or not, both in terms of what you saw and what we provided in the documents.

Let me end with this before I turn it over, perhaps, to Ms. Adams or Ms. Geyer.

Counsel kind of had the thinly veiled fear of us inviting error, and that's simply not true.

There is a reason that the appellate standard is an abuse of discretion and that the Court is given great deference in matters such as this.  Your Honor, you lived through Mr. Lobbin's actions.  Mr. Mahoney did not, and an Appellate Court did not.

Your Honor, of course, if you have any questions, may I turn one more time?

(Counsel confer.)

MR. MACHLEIDT:  Would you like to hear us on the ability to pay?

I know -- I think Mr. Mahoney just sort of did a drive-by on 50 grand.  There is a lot -- we went through discovery.  It was a hard-fought fight.  There is a lot we can say that disproves and knocks out that argument, but I will leave it to you if you would like to hear us on that.

THE COURT:  No, that's all right.  I think there's plenty in the record that would dispute that 50,000, as an offer, is somehow the right number here.

And I would just note that, in that *Hayes* case, the Court's -- and that's under a 1927 sanction -- "While the District Court should decide to reduce an amount on account of the sanctioned attorney's ability to pay, it is not required to reduce the amount to that which the attorney is capable of satisfying."

So there's a number in excess, certainly, of 50,000.  I

would just say that Court is not going to hold Mr. Lobbin responsible for the full amount that I am fee shifting under the Lanham Act, but I think there's a number in between that would provide, I think, both an adequate response to what I think was just bad faith in filing this litigation, and then the allegations that were made against Kaotica regarding their alleged allegations of breach of contract and all the litigation in the framework it was presented in.

But also, I mean, there's a lot of discovery that was done that may or may not have been inappropriate. Certainly, a lot of that work was done by associates that he was supervising and maybe there is an issue there about supervision.

But, again, I don't think the full amount is the amount the Court is going to settle on, but it will be substantial because there's history here.

I mean, I have a number of cases with other judges who have made reference to counsel's, Mr. Lobbin's, behavior, his conduct, his bad faith. And it seems that over the years it's made very little impression on him that, when he stands in a court, in a federal court, before a judge, representing his client, he needs to be honest, he needs to apply the appropriate law, he needs to represent that -- to the Court he has an obligation to the Court, above anything else, to be frank and be ethical and professional. And I did not see that conduct here. And I think there are a number of other judges

who have issued sanctions against him who have made the same conclusion.

So to the extent your counsel has argued this is going to send a message, and I think Kaotica's counsel has underscored that, yes, the message is that this Court expects people to come to court and accept what they have to abide by, their contractual obligations.

If he made a bad call for his client in entering the settlement agreement that he repeatedly told the Court was not adequate, was wrong, that they didn't agree with, that they didn't do anything wrong, but he signed it and entered it, it was a commitment.  It was an obligation.  It wasn't a settlement with "whereas" clauses that we don't infringe.  It was a judgment, a consent judgment, entered in this court.

And again, the whole thing, for me, goes back to the denial, the denial of the obligations that that imposed on him in counseling his client, in representing to the Court, in litigating against Kaotica, and in making representations to the jury as to what this case was about.  And I think it was just -- it was just an inherently willful bad faith to continue to just ignore those obligations.

So I am done for today.  I have another matter that's waiting.

I will issue a written order before the end of the week.

Yes?

MR. MACHLEIDT:  Briefly, if I may request, in the order, please consider putting a date by when payment must be made.  Just based on the record of other sanctions cases with Mr. Lobbin, it seems, if there is no date, that may lead to yet further disputes.

THE COURT:  I suspect that, given the amount the Court is thinking of settling on, giving a firm date is going to be difficult for him to meet; however, a good-faith effort to make regular payments to try and satisfy the judgments -- obviously, you are going to have your judgment.  You already have your award here against Iconic.  You are going to add to that the attorney's fees.  And all of this, I am sure, is going to go up on appeal.

That's all for today.  Thank you, Counsel.

MR. MACHLEIDT:  Thank you, Your Honor.

MR. MAHONEY:  Thank you, Your Honor.

MR. OLALEYE:  Thank you, Your Honor.

(End of proceedings at 11:02 a.m.)

-o0o-

C-E-R-T-I-F-I-C-A-T-I-O-N

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Dated:  August 21, 2025.

/s/  Chari Bowery

_____
Chari Bowery, CSR No. 9944, RPR, CRR